STATE OF MAINE
KENNEBEC, ss.

SUPERIOR COURT
DKT. NO. AP-20-15

In re: Islam K.

)
)
)

ORDER

Islam K. appeals from the order for involuntary hospitalization entered by the District Court (*Rushlau, J.*) after hearing on February 19, 2020. The order required Islam K. to be hospitalized for a period not to exceed 60 days at Riverview Psychiatric Center. 34-B M.R.S. § 3864 (2020).

The appeal was filed in the Kennebec County Superior Court on March 18, 2020, and was transferred to the undersigned on June 2, 2020. A briefing schedule was issued on June 8, 2020. Appellant's brief was filed on July 15, 2020 and Appellee's brief was filed on August 13, 2020. No reply brief was filed. Oral argument was held on September 11, 2020. Attorney Greenbaum appeared for the Appellant and Attorney Abraham appeared for the Appellee.

For the reasons set forth below, the District Court Order for Involuntary Hospitalization is affirmed.

## 1. FACTS

Islam K. was admitted to Riverview on February 4, 2020. (Tr. 5.) Psychiatric nurse practitioner Shauna Sedler was his admitting provider and continued as his attending provider. (Tr. 5.) She noted that he had been transferred to Riverview from Mercy Hospital Emergency Department where he had been admitted on January 30th.[1] (Tr. 5.) Just two days before his admission to Mercy Hospital, Islam K. had been discharged against medical advice after an 18-

---

[1] While at Mercy Hospital, he required intramuscular medication over objection and under restraint due to safety concerns around his aggressive and assaultive-type behavior. (Tr. 21, 27-28.)

1

day hospitalization at St. Mary's Hospital.[2] (Tr. 5.)

N.P. Sedler noted that Islam K. presented to Riverview with symptoms of mania, erratic and disruptive behavior, insomnia, elevated mood, and grandiose ideas.[3] (Tr. 5.) His medical history included a traumatic brain injury from his adolescence. (Tr. 6; Examiner's Report 1.) Though Islam K. showed some positive response to the medication he was administered, he continued to demonstrate hypomanic symptoms including mood dysregulation, a high level of irritability, difficulty sleeping, and some intrusive and demanding behaviors. (Tr. 6-7.)

On multiple occasions while at Riverview, Islam K. displayed agitation and aggression, including two episodes the day before the hearing (Tr. 7, 17). His behavior at Riverview included kicking the doors, making threat(s) against staff, and making verbal threats against the President of the United States. (Tr. 7, 20). The threat against the President needed to be reported to Homeland Security because Islam K. is under surveillance by the Secret Service due to his breaking into the Iraqi Embassy.[4] (Tr. 7.) On two other occasions while at Riverview, due to his behavior (deemed an imminent threat to the safety of others), Islam K. had to be placed in the "seclusion room." (Tr. 20, 29). While at Riverview, Islam K. made overt threats of harm to others. (Tr. 20, 23). He also had unspecified non-physical "problems" with other patients at Riverview (Tr. 10-11).

In Ms. Sedler's opinion, Islam K. suffered from bipolar disorder, type 1, with psychotic features. (Tr. 12.) It was her opinion that Islam K. posed a risk of harm to others. (Tr. 12-13, 23).[5] Additionally, she opined that secondary to his impulsivity, poor judgment, and high agitation, he would not be able to assess risk appropriately, and this in turn might also lead to

---

[2] Islam K. was hospitalized on three separate occasions in January. (Tr. 55.)

[3] The grandiose ideas included pronouncements that he would become president. (Tr. 10, 31.) It is unclear whether Islam K. was serious in these statements, or was merely attempting to be humorous. (Tr. 31-32, 53-54.)

[4] In 2015, Islam K. reportedly broke into the Iraqi embassy in Washington, D.C. when manic. (Tr. 7-8, 76-77.)

[5] NP Sedler noted a specific threat Islam K. made against a nurse at Riverview. (Tr. 20.)

harming himself. (Tr. 12- 13, 23.) She also cited his own admission of driving upwards of 100 miles per hour from Lewiston to Portland on or around January 30, 2020.[6] (Tr. 13, 28.)

Moreover, N.P. Sedler opined there were not adequate community resources available to care for him and treat him in his condition.[7] (Tr. 13.) Consequentially, she believed that continued confinement at Riverview was the least restrictive alternative. (Tr. 13.) Her treatment plan for him was continued stabilization on psychiatric medications, with the possibility of trying other medications due to one medication at maximum dosage only seeming to moderate symptoms but not providing for remission of his symptoms. (Tr. 13-14.) She was also entertaining the possibility of pursuing a progressive treatment plan because of his admitted history of stopping the use of his medications in order to experience the euphoria associated with his manic symptoms. (Tr. 14.) This led her to request a commitment of 60 days. (Tr. 14-15.)

The District Court also heard testimony from independent psychiatrist, Dr. Charles Robinson, who reviewed relevant medical records and personally examined Islam K. (Tr. 33.) Dr. Robinson described Islam K. as pleasant to be around with an apparent sense of humor. (Tr. 33.) He further explained that Islam K. displayed an expansive mood as part of his hypomanic presentation related to the bipolar disorder. (Tr. 34.) Dr. Robinson agreed with Ms. Sedler's diagnosis of bipolar and noted this was a clear case of the illness. (Tr. 39.) Dr. Robinson explained that Islam K. will take some offense over a word or act, real or imagined, and "tweak out", which does not "bode well ... for him to navigate in the community." (Tr. 36.) Dr. Robinson's biggest concern was the risk Islam K. posed to himself and others based on recent episodes at Riverview which involved threatening people, kicking doors, banging his head, and requiring seclusion. (Tr. 36.) It was of additional concern that these episodes occurred while he

---

[6] Islam K. admitted to driving upwards of 100 miles per hour, but he sought to justify it by stating that he would only do so when no other cars were around. (Tr. 52-53.)

[7] She was only aware of one brother in the United States who was at least somewhat supportive of Islam K. (Tr. 12.)

was in an atmosphere designed to minimize the risk of such an "outburst." (Tr. 39.) Dr. Robinson noted that making threats against the President and breaking into an Embassy are good ways to get yourself killed (Tr. 39.) Dr. Robinson opined that Islam K. posed a substantial risk of serious physical harm to himself or others, and that there were no adequate community resources available to him at that time. (Tr. 39-40.) He agreed with the treatment plan proposed by Ms. Sedler and believed that inpatient treatment was the least restrictive alternative. (Tr. 40.)

Islam K. also testified at his commitment hearing. He acknowledged that he is currently suffering from mental illness and recognized the need for treatment. Islam K. indicated he wished to work with the outpatient providers and the local ACT team to receive long lasting, injectable medications. (Tr. 48-49.) Islam K. also expressed his desire to be released so that he could pay his rent and return to work because he was worried about losing his job. (Tr. 50-51.) He also mentioned the possibility of returning to Iraq to be with his family. (Tr. 75.)

At the conclusion of the hearing, the District Court, acting pursuant to 34-B §3864 (6) and 34-B §3864 (7), ordered Islam K. to be committed to Riverview Psychiatric Center for a period of time not to exceed 60 days. (Tr. 81.) In particular, the District Court found that there was clear and convincing evidence that Island suffered from a mental illness and that his recent actions and behavior demonstrated his mental illness caused a likelihood of serious physical harm to himself and the community; that community resources for his care and treatment were insufficient; and that inpatient hospitalization and the individualized treatment plan that was in process was the best available means for the treatment of Islam K. (Tr. 79-80).

2.   **DISCUSSION**

   a. **Standard of Review**

Appeals to the Superior Court of hospitalization orders are "on questions of law only," and the "findings of fact of the District Court [will] not be set aside unless clearly erroneous."

4

34-B M.R.S. § 3864(11)(A)-(B). The Court "will reverse a finding only if there is no competent evidence in the record to support it, if the factfinder clearly misapprehends the meaning of the evidence, or if the finding is so contrary to the credible evidence that it does not represent the truth and right of the case . . . ." *In re Henry B.*, 2017 ME 72, ¶ 18, 159 A.3d 824 (citation and quotation marks omitted).

### a. Mootness

Islam K.'s hospitalization expired long before this appeal was transferred to the undersigned. In most situations, this would mean that the appeal is moot. *See In re Steven L.*, 2017 ME 5, ¶ 8, 153 A.3d 764 ("Generally, we decline to hear an appeal when the issues are moot, that is, when they have lost their controversial vitality, and our decision would not provide an appellant any real or effective relief."). Nonetheless, there are limited circumstances in which courts will reach the merits of cases that are moot. *See Me. Civil Liberties Union v. City of S. Portland*, 1999 ME 121, ¶ 9, 734 A.2d 191. The parties agree that this appeal is not moot. The Court concludes that there are collateral consequences to the hospitalization order. *See In re Walter R.*, 2004 ME 77, ¶ 10, 850 A.2d 346 ("One collateral consequence of Walter's involuntary commitment hearing is the fact that if he faces a second commitment proceeding, the term of commitment will be up to one year . . . Another consequence of the commitment order is the prohibition against possessing a firearm."). Thus, the Court will proceed to the merits.

### b. Involuntary Commitment

In order for the District Court to involuntarily commit a patient to a psychiatric facility, it must find the following by clear and convincing evidence: "(1) that the person is mentally ill and poses a likelihood of serious harm, (2) that adequate community resources for the person's care are not available, (3) that inpatient hospitalization is the best available means of treatment, and (4) that it is satisfied with the individual treatment plan offered by the committing hospital." *In*

5

*Re Henry B.*, 2017 ME 72 ¶ 19, 159 A.3d (citing 34-B M.R.S. §§ 3864(6)(A), (7)). Islam K. argues on appeal that there was insufficient evidence presented to support the finding that his mental illness posed a likelihood of serious harm, that adequate community resources for his care and treatment were unavailable, and that inpatient hospitalization was the best available means of treatment. The sufficiency of the evidence to support each finding is discussed in turn.

1.    *Likelihood of Serious Harm*

A person's mental illness poses a "likelihood of serious harm" if there is, *inter alia,* a substantial risk of harm to others as manifested by violent behavior or "recent conduct placing others in reasonable fear of serious physical harm" or as manifested by "recent behavior demonstrating an inability to avoid risk." 34-B §3801 (4-A)(B)-(C).

There is no dispute that Islam K. has a mental illness, that being bipolar disorder with psychotic features. (T. 12, 75.) He even agreed with Dr. Robinson that it was a "very" accurate diagnosis. (T. 38-39.) The Court's finding that Islam's mental illness posed a likelihood of serious harm is fully supported by the expert opinions of Dr. Robinson and Ms. Sedler. Both experts testified that Islam K.'s illness posed a risk both to himself and others in the community due to his impulsivity and lack of judgment, among other symptoms that he suffers as a result of his mental illness. (Tr. 12-13, 36.) The District Court also noted that it was especially concerned with recent behavior Islam K. had demonstrated in a short period of time at Riverview, which resulted in seclusion because the situation could not be resolved by verbal means. (Tr. 36, 79.) Additionally, the court expressed that Islam K.'s behavior may result in physical harm because people in the community would likely find his behavior threatening and disturbing and would not know how to react to his aggressiveness. (Tr. 79.) This finding was supported by sufficient evidence in the record and was not clearly erroneous.

2.    *Availability of Adequate Community Resources and In-Patient Treatment as the Least*

6

*Restrictive Means*

To order a patient be involuntarily committed to a psychiatric hospital, the District Court must find by clear and convincing evidence that "adequate community resources for care and treatment of the person's mental illness are unavailable." 34-B M.R.S. § 3864(6-A)(1)(A). And after "full consideration of less restrictive treatment settings, the court must find that "inpatient hospitalization is the best available means for the treatment of the person." 34-B M.R.S. §3864(5)(E)(2).

The District Court did not err in finding that adequate community resources for Islam K.'s treatment and care were unavailable, and that the individualized treatment plan was satisfactory. Both Ms. Sedler and Dr. Robinson testified there were no adequate community resources available to Islam K. at the time of the hearing and that his individualized treatment plan to be implemented at Riverview was the least restrictive alternative consistent with appropriate treatment. (Tr. 13, 40.) Ms. Sedler explained the treatment plan in detail with the goal being to stabilize Islam K. on psychiatric medications. (Tr. 13-14.) She also indicated that because she had not seen remission of Islam K.'s symptoms, stabilization may require trying different medication trials. (Tr. 14.) Ms. Sedler indicated that she would also attempt to pursue a progressive treatment plan. (Tr. 14.) Dr. Robinson supported the proposed treatment plan and was hopeful that Islam K. would improve in less than sixty days. (Tr. 40.) The Court highlighted the fact that the treatment plan was still in process, and that it was going to take some time to determine what medications were going to be most helpful to Islam K. so that he can live and work safely in the community. (Tr. 80.)

The only evidence contrary to the Court's findings came from Islam K. who indicated that he preferred to work with the "Act Team" in outpatient treatment. (Tr. 51.) Islam K. stated that he had an intake appointment at some point, and did not know what would come of it. (Tr.

7

51.) After inquiring into that appointment with Islam K., the Court found that it was not a viable option to him at that time. (Tr. 73.) However, the Court did note that it may be the best solution for him once he is stabilized. (Tr. 73.) The District Court did not clearly err in finding that there were no adequate community resources available to Islam K. and that the treatment plan was satisfactory.

3.    *Capacity to make an informed decision regarding his treatment*

Islam K.'s attorney withdrew this issue during oral argument.[8]

*Conclusion*

The District Court did not clearly err in making its findings regarding each statutorily required element. The Court's findings were well supported by the evidence.

The entry is:

1.    The District Court's order requiring Islam K. to be hospitalized involuntarily for a period not to exceed 60 days in docket number MH-2020-29 is **AFFIRMED**.
2.    The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated:    9/28/2020

Ann M. Murray
Justice, Maine Superior Court

---

[8] Islam K. had argued that there was insufficient evidence to conclude that the he lacked the capacity to make an informed decision regarding his treatment. However, the District Court is not required to make such finding in ordering involuntary commitment. 34-B M.R.S. §3864(6)(A), Moreover, nothing in the record indicates that the District Court ordered Islam K. be treated without his consent.

8